UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JESSE D. ALLRED,

          Plaintiff,

    v.

CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION,
et al.,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 1:16-cv-01571-LJO-SAB (PC)

FINDINGS AND RECOMMENDATIONS
REGARDING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

[ECF No. 48]

Plaintiff Jesse D. Allred is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.

Currently before the Court is Defendants' motion for summary judgment, filed November 9, 2018.

## I.

## RELEVANT PROCEDURAL HISTORY

This action is proceeding against Defendants Duroy, Johnson-Tenner,[1] Moss and Martinez for deliberate indifference to a serious medical need in violation of the Eighth Amendment.

///

---

[1] Plaintiff referenced Defendant Johnson-Tenner as Johnson only, however, the Court follows Defendants reference to this Defendant as Johnson-Tenner.  (See MSJ, ECF No. 18.)

1

On August 28, 2017, Defendants Moss, Duroy, and Johnson-Tenner filed an answer to the complaint. (ECF No. 18.) On August 29, 2017, the Court issued the discovery and scheduling order. (ECF No. 19.)

On December 31, 2017, Defendant Martinez filed an answer to the complaint. (ECF No. 31.) On January 3, 2018, the Court extended the August 29, 2017, discovery and scheduling order to Defendant Martinez. (ECF No. 32.)

As previously stated, on November 9, 2018, Defendants filed a motion for summary judgment. (ECF No. 48.) Plaintiff filed an opposition February 11, 2019, and Defendants filed a reply on March 5, 2019. (ECF Nos. 53, 56.) Accordingly, Defendants' motion for summary judgment is deemed submitted for review, without oral argument. Id.

## II.

### LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de

Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d at 942 (quotation marks and citation omitted).

## III.

## DISCUSSION

### A.    Summary of Plaintiff's Complaint

The incidents alleged in the complaint occurred while Plaintiff was housed at Valley State Prison ("VSP").  (Compl. ¶ 6, ECF No. 1.)

Plaintiff slipped and fell in the shower on October 12, 2014 severely breaking his right wrist. (Compl. at ¶ 20.)  Plaintiff was taken to the Facility A Clinic where Defendants Duroy and Moss, instead of providing medical attention, phoned Cho who told Defendant Duroy to give Plaintiff his already prescribed evening dose of morphine.  (Compl. ¶ 21.)  Defendant Moss told Plaintiff that it was unlikely that Cho would come to the clinic to examine Plaintiff's wrist and that there were no x-rays available on the weekend.  (Compl. ¶ 22.)

Kinser told Plaintiff to return to his housing unit.  (Compl. ¶ 23.)  Plaintiff informed Kinser that he had not been provided medical attention for his broken wrist and was waiting for the duty RN to come from the main infirmary to triage him.  (Compl. ¶ 23.)  Kinser went out to speak with Defendant's Moss and Duroy and when he returned he informed Plaintiff that no RN would be coming and he needed to return to his housing unit.  (Compl. ¶ 23.)  Plaintiff returned to his housing unit. (Compl. ¶ 23.)  After Plaintiff left the clinic, Defendants Moss and Duroy completed the progress note showing that Plaintiff arrived at 3:45 p.m.  (Compl. ¶ 24.)

At 5:15 p.m., Plaintiff returned to the Facility A Clinic to try to get medical attention for his broken wrist.  (Compl. at ¶ 25.)  Kinser, the correctional officer on duty at the clinic, made Plaintiff leave after he had been there for one hour after stating that no RN would be coming to see him. (Compl. at ¶ 25.)  Plaintiff was provided with ice and returned to his housing unit.  (Compl. at ¶ 25.)

Plaintiff was having severe pain at 7:00 p.m. causing him to be dizzy, nauseous, and his heart began to race uncontrollably.  (Compl. at ¶ 26.)  Plaintiff called for help and an officer activated his personal alarm.  (Compl. at ¶ 26.)  Aguilar responded to the alarm and Plaintiff was transported to the main infirmary.  (Compl. at ¶ 26.)

Aguilar wrapped Plaintiff's right hand in an ace bandage and issued Plaintiff a sling. (Compl. at ¶ 27.) Aguilar refused to give Plaintiff pain medication and sent him back to his housing unit. (Compl. at ¶ 27.)

The following day, October 13, 2014, Plaintiff reported to the infirmary for his scheduled x-ray. (Compl. at ¶ 28.) An unidentified individual approached Plaintiff and told him that he would not be receiving an x-ray because the machine was broken and the parts to repair it might not be available for a week. (Compl. at ¶ 28.) Plaintiff was instructed to return to his housing unit. (Compl. at ¶ 28.) Plaintiff had previously been told by the unidentified individual that in his view inmate's punishment should include the total denial of medical care and denial of the permission to play sports and should have to remain in their cell 23 out of 24 hours. (Compl. at ¶ 30.)

As Plaintiff was returning to his housing unit another inmate asked him how he was doing. (Compl. at ¶ 29.) Another x-ray technician heard Plaintiff explaining that the x-ray machine was broken and told Plaintiff to go to the Facility A Clinic and wait for her call. (Compl. at ¶ 29.) Approximately ten minutes later, Plaintiff was called back to the infirmary where this x-ray technician took an x-ray of Plaintiff's wrist. (Compl. at ¶ 29.)

After the x-rays were taken, Defendant Johnson told Plaintiff that he had multiple fractures in his right wrist and would need surgery, requiring pins and screws, and or plates for it to heal properly. (Compl. at ¶ 31.) Defendant Johnson did not provide for an emergency transport to the hospital for treatment. (Compl. at ¶ 32.)

On October 15, 2015, Plaintiff filed a request for health care services requesting that he be seen by an orthopedic surgeon. (Compl. at ¶ 33.)

On October 20, 2015, Plaintiff was sent to an outside facility for consultation with an orthopedic surgeon. (Compl. at ¶ 34.) The surgeon told Plaintiff that he needed surgery immediately and requested that VSP medical staff obtain a CT scan and return Plaintiff for surgery. (Compl. at ¶ 34.)

On October 28, 2015, Plaintiff received copies of his medical records and discovered that Defendants Moss and Duroy falsified the progress note to prevent discovery of their mistake in not properly triaging Plaintiff. (Compl. at ¶ 36.) The October 12, 2014 progress note stated that Plaintiff

did not stay in the clinic to complete the encounter but returned to the housing unit taking his prescribed medication at the pill line.  (Compl. at ¶ 36.)

On November 4, 2014, Kinser wrote a memorandum in an effort to absolve himself from culpability stating that Plaintiff did not refuse treatment but was told to return to the housing unit. (Compl. at ¶ 37.)  Plaintiff insisted that he was in extreme pain and his wrist was broken and it took much argument to get him to return to the housing unit.  (Compl. at ¶ 37.)  When Plaintiff returned to the clinic later that day, Kinser saw Plaintiff's hand wrapped in ice for approximately another hour waiting for the RN to return.  (Compl. at ¶ 37.)  When the RN did not return, Plaintiff returned to his housing unit.  (Compl. at ¶ 37.)

On November 19, 2014, Plaintiff received an MRI, but did not get an MRI with contrast because the technician stated Plaintiff did not meet the criteria for ordering the services.  (Compl. at ¶ 38.)  On November 21, 2014, Defendant Johnson saw Plaintiff and reviewed the MRI results.  (Compl. at ¶ 39.)  Defendant Johnson informed Plaintiff that she was submitting a request for surgery on an urgent basis.  (Compl. at ¶ 39.)  Plaintiff saw Defendant Johnson again on December 9, 2014, and she explained that the delay in surgery was due to the Thanksgiving holiday.  (Compl. at ¶ 40.)

Plaintiff ran into Defendant Johnson outside the clinic on January 12, 2015.  (Compl. at ¶ 41.) When he mentioned that he still had not had surgery, Defendant Johnson stated that they got caught up in the Christmas holiday.  (Compl. at ¶ 41.)  During this time, Plaintiff had submitted about six administrative appeals regarding not being provided treatment and he had multiple casts that were removed and replaced.  (Compl. at ¶ 42.)

On January 20, 2015, Plaintiff had a telemedicine consultation with an orthopedic specialist. (Compl. at ¶ 44.)  The orthopedic specialist stated that due to the length of time between when Plaintiff had broken his wrist and the consultation, Plaintiff's wrist was deformed, arthritis had set in, and it was now inoperable.  (Compl. at ¶ 44.)

Plaintiff was taken to an outside facility for an orthopedic consultation.  (Compl. at ¶ 45.) While waiting to see the doctor, Plaintiff overheard two doctors talking about his case stating that CDCR had waited too long, arthritis had set in and this did not have to happen.  (Compl. at ¶ 45.) After waiting more than an hour, one of the transportation officers asked when Plaintiff was going to

be seen and was told that CDCR had waited too long for Plaintiff to have surgery. (Compl. at ¶ 46.)

Plaintiff's right wrist is permanently damaged and causes Plaintiff extreme and constant debilitating pain. (Compl. at ¶ 49.)

**B.      Statement of Undisputed Facts**

1.      Plaintiff Jesse Allred is a state prisoner. He was in the custody of California Department of Corrections and Rehabilitation (CDCR) and housed at VSP during the alleged events in this action. (Compl. ¶ 6, ECF No. 1.)

2.      Defendants N. Moss, M. Duroy, M. Martinez, and P. Johnson-Tenner were each employed by CDCR at VSP during the alleged events in this action. Moss and Duroy were Licensed Vocational Nurses (LVN). Martinez was a Licensed Radiologic Technologist. Johnson-Tenner was a licensed Nurse Practitioner. (Moss Decl. ¶ 1; Duroy Decl. ¶ 1; Martinez Decl. ¶ 1; Johnson Decl. ¶ 1.)

3.      On October 12, 2014, Plaintiff presented to the Facility A clinic complaining that he had fallen on the ground and hurt his wrist. (Moss Decl. ¶ 8; Duroy Decl. ¶ 7; AGO 001.)

4.      Duroy conducted a preliminary assessment of his complaints. (Moss Decl. ¶ 10; Duroy Decl. ¶ 8; AGO 001.)

5.      Duroy relayed that information to Registered Nurse (RN) Cho in the infirmary, who then relayed the information to Dr. Shwe, the after-hours and on-call physician. (Moss Decl. ¶¶ 11-12; Duroy Decl. ¶¶ 9-10; AGO 001-003.)

6.      Dr. Shwe's treatment plan was to provide Plaintiff with a previously prescribed dose of morphine for his complaints of pain, and then to ducat him the following morning to be evaluated by an RN. (Moss Decl. ¶ 12; Duroy Decl. ¶ 10; AGO 002-003.)

7.      Plaintiff was then administered a dose of morphine. (Moss Decl. ¶ 12; Duroy Decl. ¶ 11; AGO 003.)

8.      During this time, inmates throughout the institution were directed back to their housing units for the afternoon count. Inmates are required to be in their cells and accounted for no later than 4:30 p.m. each day. The only exception is for inmates who are in impatient care. Plaintiff therefore was directed to return to his housing unit. (Moss Decl. ¶¶ 13-14; Duroy Decl. ¶¶ 12-13; AGO 002.)

///

9.     Plaintiff returned to the clinic after the count at approximately 5:45 p.m.  (Moss Decl. ¶ 16; Duroy Decl. ¶ 14; AGO 001.)

10.     Duroy measured Plaintiff's vital signs again.  (Moss Decl. ¶ 17; Duroy Decl. ¶ 15; AGO 001-003.)

11.     Plaintiff was provided ice around this time and then later returned to his housing unit for the evening count.  (Moss Decl. ¶¶ 18-19; Duroy Decl. ¶¶ 16-17.)

12.     Later than evening, at approximately 6:50 p.m., custody staff in Plaintiff's housing unit activated an alarm regarding a medical emergency.  (Moss Decl. ¶ 20; Duroy Decl. ¶ 18; AGO 004.)

13.     Duroy and Moss rushed to Plaintiff's housing facility, where they met RN Aguilar. Plaintiff complained of chest pain.  His symptoms were analyzed and RN Aguilar drove him away to the infirmary.  (Moss Decl. ¶¶ 21-23; Duroy Decl. ¶¶ 19-20; AGO 004-006.)

14.     Duroy and Moss did not provide further clinical care to Plaintiff relating to this action. (Moss Decl. ¶ 24; Duroy Decl. ¶ 21.)

15.     The following morning, on October 13, 2014, Plaintiff appeared at the infirmary for an x-ray of his wrist that had been ordered the previous evening by Dr. Shwe.  (Martinez Decl. ¶ 9; AGO 007-008.)

16.     Plaintiff's wrist was x-rayed at approximately 10:11 a.m. the same morning.  (Martinez Decl. ¶¶ 9, 11; AGO 013.)

17.     Plaintiff presented to Johnson-Tenner later that day on October 13, 2014.  Johnson-Tenner conducted a clinical evaluation.  She discussed x-rays showing Plaintiff had an impacted distal radial fracture.  (Johnson-Tenner Decl. ¶¶ 10-11; AGO 013-014.)

18.     Johnson-Tenner (1) directed Plaintiff to the infirmary to have a cast set on his arm; (2) entered an urgent-care referral for Plaintiff to be seen by an orthopedist; (3) ordered a follow-up x-ray and appointment within six to eight weeks; (4) and directed custody staff to provide him with accommodations.  (Johnson-Tenner Decl. ¶¶ 12-13; AGO 014-016.)

19.     On October 20, 2014, Plaintiff was evaluated by Dr. Crooks, an orthopedist at San Joaquin Community Hospital).  Dr. Crooks recommended that Plaintiff undergo a computed tomography (CT) scan of his wrist and that he be fit with a short arm cast.  (Johnson-Tenner Decl. ¶

18; AGO 018.)

20.    Plaintiff presented to Johnson-Tenner for a follow-up clinical evaluation on November 4, 2014.  Johnson-Tenner discussed Dr. Crook's consultation with Plaintiff.  (Johnson-Tenner Decl. ¶¶ 23-24; AGO 024.)

21.    Johnson-Tenner ordered Plaintiff to have a CT scan taken of his wrist, reviewed his medications, and instructed him to keep his arm elevated.  (Johnson-Tenner Decl. ¶¶ 24-25; AGO 024, 026.)

22.    Plaintiff had the CT scan taken for his right wrist on November 19, 2014.  The scan showed a comminuted distal radius fracture with intra-articular extension.  There was mild fracture impaction without significant displacement or angulation.  The fracture lines were still visible without evidence of significant healing.  The fracture was in alignment.  (Johnson-Tenner Decl. ¶ 29; AGO 039.)

23.    Plaintiff presented to Johnson-Tenner for a follow-up clinical evaluation on November 21, 2014.  Johnson-Tenner analyzed the findings from the CT scan.  She believed that the fracture lines were still visible because the injury occurred approximately five weeks earlier.  The findings also indicated that there was not a lot of calcification occurring at the fracture site to help the bones mend. This could have been due to Plaintiff's age.  (Johnson-Tenner Decl. ¶¶ 30-31; AGO 040.)

24.    Johnson-Tenner ordered Plaintiff to have a follow-up consultation with an orthopedist. (Johnson-Tenner Decl. ¶ 32; AGO 040-041.)

25.    On December 4, 2014, Johnson-Tenner ordered a prescription for Osacal for Plaintiff, which is a calcium supplement that she believed would help the calcification process in his wrist. (Johnson-Tenner Decl. ¶ 34; AGO 043.)

26.    Plaintiff presented to Johnson-Tenner again on December 9, 2014.  She noted that his cast was loose, likely because his wrist was healing and due to decreased swelling.  (Johnson-Tenner Decl. ¶ 38; AGO 046.)

27.    Johnson-Tenner ordered Plaintiff's case to be removed and for a new cast to be fit.  She also ordered abrasions to be cleaned and treated with double antibiotic ointment.  She then ordered another orthopedic consultation.  (Johnson-Tenner Decl. ¶ 39; AGO 046.)

28.     Plaintiff next presented to Johnson-Tenner for another clinical visit on January 14, 2015. Johnson-Tenner noted that the swelling in Plaintiff's wrist had further decreased and the cast was loose. Johnson-Tenner further noted that Plaintiff had not been seen by an orthopedist as she had ordered after the visit on November 21, 2014. (Johnson-Tenner Decl. ¶¶ 46-47; AGO 053.)

29.     Johnson-Tenner ordered Plaintiff's cast to be removed, for his arm to be cleaned, and for a new cast to be set. Johnson-Tenner then submitted another request for Plaintiff to be seen for an orthopedic consultation. (Johnson-Tenner Decl. ¶¶ 47-48; AGO 053-054.)

30.     Less than a week later, on January 20, 2015, Plaintiff was evaluated by orthopedist Dr. Galang at San Joaquin General Hospital via telemedicine and with the assistance of nursing staff. Dr. Galang noted that Plaintiff was previously evaluated by Dr. Crooks. Dr. Galang further noted that Plaintiff was still complaining of pain in his right wrist and that the most recent scan showed a continued distal radial fracture with no significant displacement. Dr. Galang recommended that Plaintiff undergo a new x-ray of his right wrist without the cast. He then recommended that Plaintiff wear a brace after that and to be seen again for a follow-up appointment after the x-ray is completed. (Johnson-Tenner Decl. ¶ 50; AGO 056-057.)

31.     Plaintiff presented to Johnson-Tenner shortly after his telemedicine appointment with Dr. Galang for a follow-up clinical evaluation. Johnson-Tenner ordered Plaintiff's cast to be removed and x-rays to be taken of his wrist. She further ordered that telemedicine should be notified when the x-ray findings were available and that Plaintiff should be provided with a writs brace per Dr. Galang's recommendation. (Johnson-Tenner Decl. ¶¶ 51-52; AGO 0058-059.)

32.     Plaintiff underwent an x-ray of his wrist the same day showing that the distal radius fracture appeared to be healed, alignment was stable, and that there was no new fracture. The x-ray also showed mild wrist joint and intercarpal arthritis, which is normal for this type of injury. (Johnson-Tenner Decl. ¶ 54; AGO 061.)

33.     Plaintiff's housing assignment changed after this appointment, and Johnson-Tenner did not provide further direct clinical care. (Johnson-Tenner Decl. ¶ 55; AGO 063.)

34.     Plaintiff was later seen by Dr. Crooks, his original orthopedist, to discuss the x-ray findings on March 20, 2015. Dr. Crooks noted that there was no clinical need for surgery or further

treatment other than providing Plaintiff his removable splint.  (Johnson-Tenner Decl. ¶ 63; AGO 080-081.)

### C.    Analysis of Defendants' Motion

Defendants argue that they provided Plaintiff appropriate and comprehensive treatment each time he presented with a medical need.  Defendants Duroy and Moss's involvement was limited to one afternoon and they provided the treatment as directed by a non-party RN and non-party physician.  Plaintiff cannot prevail against Defendant Martinez because Plaintiff received the ordered x-ray of his wrist the same morning he allegedly interacted with Martinez and there is no evidence that any delay caused harm.  Defendant Johnson-Tenner examined Plaintiff on multiple occasions, ordered multiple diagnostic studies, made multiple referrals for orthopedic consultations, ordered medication, and re-fit Plaintiff with new casts as needed.

While the Eighth Amendment of the United States Constitution entitles Plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th Cir. 2014); Wilhelm, 680 F.3d at 1113; Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).   The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care.  Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

"A difference of opinion between a physician and the prisoner – or between medical professionals – concerning what medical care is appropriate does not amount to deliberate indifference."  Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989), overruled in part on other grounds, Peralta, 744 F.3d at 1082-83; Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986).  Rather, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health."  Snow, 681

F.3d at 988 (citing <u>Jackson</u>, 90 F.3d at 332) (internal quotation marks omitted).

     1.    <u>Defendants Moss and Duroy</u>

     Plaintiff presented to Defendants Moss and Duroy after he fell on his wrist.  Duroy measured Plaintiff's vital signs, documented the complaints, and conveyed the information about his condition to non-party RN Cho at the institution infirmary.  RN Cho then relayed the information to Dr. Shwe, the after-hours and on-call physician.  Dr. Shwe directed that Plaintiff be administered a previously-prescribed dose of morphine and be ducated to return to the clinic the following morning for further evaluation.  This information was conveyed back to RN Cho, and then to Duroy-who followed the order.  Thus, Plaintiff received a dosage of morphine and returned to his housing unit for the afternoon count.

     Plaintiff then returned to the clinic later that afternoon after count cleared, and his vital signs were measured again.  Plaintiff was provided ice around this time and then later returned to his housing unit for the evening count.  Later that evening, custody staff called for a medical emergency, and Duroy and Moss responded to the housing unit.  Non-party RN Aguilar arrived around the same time.  Plaintiff's vital signs were taken and his physical condition was evaluated by use of the CDCR Triage & Treatment Services Flow Sheet.  Aguilar then drove Plaintiff away from the infirmary.  Add what else he was provided.

     Defendants have met their burden of proof in demonstrating they were not deliberately indifferent to Plaintiff's medical needs, and the burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact actually does exist.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the mere allegations or denials of his pleading; he is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11.

     Plaintiff argues that Duroy and Moss ignored his complaint about his wrist and only relayed information concerning his left elbow to RN Cho.  (Pl. Opp'n at 6, 11-12, ECF No. 53.)  Plaintiff contends that the treatment plan by RN Cho and Dr. Shwe did not address his wrist, and Moss and Duroy were deliberately indifferent for following the plan.  (<u>Id.</u>)  Plaintiff continues to dispute the

information that was relayed between Duroy, RN Cho, and Dr. Shwe. (Pl. Opp'n at 23-25.) Plaintiff also disputes the details of his treatment plan, the circumstances regarding his morphine, and that Duroy and Moss failed to provide him ice. (Id. at 25-28.)

The medical records clearly indicate that Duroy acknowledged Plaintiff's injury to his left elbow and right wrist. (Duroy Decl. ¶ 7; Garcia Decl. Ex. A, at AGO 001, ECF No. 48-5.) Duroy conducted a preliminary examination by taking Plaintiff's vital signs, assessed his ability to ambulate, and assessed whether he exhibited respiratory distress. (Id.) Duroy then contacted RN Cho and conveyed the information. (Duroy Decl. ¶ 9.) RN Cho then contacted Dr. Shwe, who both developed a treatment plan, which accounted for Plaintiff's prescription for morphine, and for Plaintiff to return to visit the RN the following morning. (Garcia Decl. Ex. A, at AGO 002-003.)

Plaintiff speculates that Duroy did not convey the right wrist injury to RN Cho. Plaintiff has no foundation or first-hand knowledge of what was discussed during the phone call between Duroy and RN Cho, and he is simply speculating based on what he believes is absent from RN Cho and Dr. Shwe's treatment notes. However, Duroy declared that she informed RN Cho about Plaintiff's complaints, and there is not sufficient evidence to prove otherwise. (Duroy Decl. ¶ 9.)

With regard to the receipt of morphine, Plaintiff concedes in his complaint that he already had an existing prescription for 15mg of morphine in the evenings. (Compl. at 11:21-23, ECF No. 1.) RN Cho's progress note reflected Plaintiff's prescription for "MS15ER" (morphine sulfate 15mg extended release). (Garcia Decl. Ex. A, at AGO 002.) Dr. Shwe's telephone note also reflected Plaintiff is "on morphine." (Id. at AGO 003.) Plaintiff was also denied additional morphine during his visit in the infirmary with RN Aguilar. (Id. at AGO 006.)

With regard to the receipt of ice, Plaintiff indicates that he received it from an unknown office clerk. (Pl. Opp'n at 28.) Duroy declared that she did not know who provided Plaintiff the ice but was aware that he had ice. (Duroy Decl. ¶ 16.) However, there is no evidence that Duroy had access to ice and that she refused to provide it to Plaintiff. In addition, there is no evidence that the ice would have made a significant clinical impact on his condition in light of the morphine and plan for him to return for further treatment the next morning, which both occurred.

As licensed vocational nurses, these Defendants do not have authority to practice medicine and may not prescribe and/or change Plaintiff's medications.[2] The law cannot impose liability upon these Defendants for adhering to the treatment plan issued by the registered nurse and physician after disclosing the medical conditions.

Furthermore, any delay in providing treatment at the initial visit with Duroy and Moss did not result in harm, and Plaintiff's claim fails as a matter of law. See Shapley v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). The events involving LVNs Duroy and Moss took place over a course of approximately three hours in which Plaintiff had three separate clinical visits. (Garcia Decl. Ex. A, at AGO 001 (first contact at 3:45 p.m.); AGO 001 (second contact at 5:45 p.m.); AGO 006-007 (third contact at 7:00 p.m.).) In addition to the treatment plan developed by RN Cho and Dr. Shwe, of which Duroy and Moss were required to follow, Plaintiff was also subsequently transported to the infirmary at 7:00 p.m. for further care and was sent back to his housing unit twenty-five minutes later. (See Garcia Decl. Ex. A, at AGO 006 (returned to custody at 7:25 p.m. in stable condition with swift and steady gait).) Then, the next morning, Plaintiff returned to the infirmary again for his planned x-ray and further treatment. (Id. at AGO 009-015.) Therefore, even if there was an initial delay in treatment by Duroy and Moss, there was no resulting harm because Plaintiff was provided further treatment within a matter of a few hours and the following day, and there is no evidence that any initial delay exacerbated Plaintiff's injury. See, e.g., Wood v. Housewright, 900 F.2d 1332, 1333, 1335 (9th Cir. 1990) ("several days" of delay after inmate "broke one of the pins in his shoulder" was not deliberate indifference); Carr v. Cal. Dep't of Corr., No. 14-cv-02074-LJO BAM (PC), 2016 WL

---

[2] When resolving an Eighth Amendment claim against individual defendants, causation must be resolved via "a very individualized approach which accounts for the duties, discretion, and means of each defendant." Leer v. Murphy, 844 F.2d 628, 633-34 (9th Cir. 1988) (citing with approval Williams v. Bennett, 689 F.2d 1370, 1384 (11th Cir. 1982) ("There can be no duty, the breach of which is actionable, to do that which is beyond the power, authority, or means of the charged party. One may be callously indifferent to the fate of prisoners and yet not be liable for their injuries. Those whose callous indifference results in liability are those under a duty – possessed of authority and means – to prevent the injury.") The State of California prohibits unlicensed persons from treating the sick or afflicted, diagnosing, treating, operating, or prescribing for any physical or mental condition without proper certification or authorization. Cal. Bus. & Prof. Code, § 2502. The practice of vocational nursing is defined as "the performance of services requiring those technical, manual skills acquired by means of a course in an approved school of vocational nursing, or its equivalent, practiced under the direction of a licensed physician, or registered professional nurse …" Cal. Bus. & Prof. Code, § 2859. LVN's are not authorized to practice medicine and may be subject to prosecution and imprisonment if they do so. Cal. Bus. & Prof. Code, §§ 2860, 2887.

6648639, at *3 (E.D. Cal. Nov. 9, 2016) (23-day delay in "receiving pain medication and treatment for a broken rib" was not deliberate indifference); Lambert v. Soto, No. 10-cv-1976-AJB (BLM), 2012 WL 5878503, at *5-6 (S.D. Cal. Sept. 21, 2012) (16-da7 delay in treating plaintiff's "swelling and bleeding," "serious injuries to [plaintiff's] back," "difficulty breathing," "a disclosed shoulder," and an inability "to bear any weight on his leg due to a severe knee sprain" was not deliberate indifference). Based on the undisputed evidence, there is no genuine issue of material fact as to whether Defendants Moss and Duroy were deliberately indifferent, and summary judgment should be granted in their favor.

       2.   <u>Defendant Martinez</u>

It is undisputed that on October 12, 2014, Dr. Shwe ordered Plaintiff to be ducated the following morning to have an x-ray taken of his right wrist. Plaintiff appeared in the infirmary for his x-ray the next morning and an x-ray was taken at approximately 10:11 a.m. Plaintiff then met with Johnson-Tenner at approximately 12:05 p.m. that day and was fit with a cast.

Plaintiff contends that Martinez initially told him that the x-ray machine was broken. (Compl. ¶ 28.) Then, as Plaintiff was walking back to his housing unit, he was called back to the infirmary by another x-ray technician, and the x-ray was conducted. (Compl. at ¶ 29.) Plaintiff has not and cannot state a cognizable claim against Defendant Martinez, because mere delay in providing medical treatment does not constitute deliberate indifference. <u>Shapley v. Nev. Bd. of State Prison Comm'rs.</u>, 766 F.2d 404, 407 (9th Cir. 1985); <u>see also</u> <u>Jett v. Penner</u>, 439 F.3d at 1096 (Deliberate indifference "is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference); <u>Wood v. Housewright</u>, 900 F.2d 1332, 1335 (9th Cir. 1990) ("Nor does the delay in treatment that [Plaintiff] suffered constitute an eighth amendment violation; the delay must have caused substantial harm.")

Plaintiff has failed to demonstrate that any delay caused additional harm in this instance. Even assuming the validity of the contentions in Plaintiff's complaint, there are no allegations that the time that passed between Plaintiff walking back to his housing unit, and then returning to the infirmary to receive his x-ray, caused any further, substantial, or unnecessary harm. Nor is there any evidence in Plaintiff's medical record to demonstrate that he was diagnosed with any further injury because of any

delay. In fact, the evidence demonstrates that Plaintiff received an x-ray of his wrist at approximately 10:11 a.m. on October 12, 2014, and less than two hours later at 12:05 p.m., he met with Johnson and was ordered to be fit with a cast. Thus, Plaintiff has not and cannot demonstrate deliberate indifference because it is undisputed that any short delay did not lead to further harm. Accordingly, summary judgment should be entered in favor of Defendant Martinez.

3.    <u>Defendant Johnson-Tenner</u>

Plaintiff first presented to Johnson-Tenner the day after his injury on October 13, 2014. At that time, Johnson-Tenner ordered Plaintiff's arm to be fit in a cast, submitted a request for an orthopedic consultation, and ordered custody staff to provide Plaintiff with housing and programming accommodations.

On October 20, 2014, Plaintiff was examined by an orthopedist, who ordered a CT scan of his wrist and that he be fit with a short arm cast. There was no order for surgery. Johnson-Tenner saw Plaintiff again on November 4, 2014, ordered the CT scan, and ordered Plaintiff to be fit with a short arm cast, per the orthopedist's recommendation. The CT scan took place on November 19, 2014, and Plaintiff had a follow-up clinical visit with Johnson-Tenner to discuss the findings on November 21, 2014. Johnson-Tenner ordered another consultation with the orthopedist, and prescribed a calcium supplement to help the healing process. Plaintiff presented to Johnson-Tenner again on December 9, 2014. She noted that his cast was loose, likely because his wrist was healing and due to decreased swelling. Johnson-Tenner ordered Plaintiff's case to be removed and for a new cast to be fit. She also ordered abrasions to be cleaned and treated with double antibiotic ointment. She then ordered another orthopedic consultation.

 Plaintiff next presented to Johnson-Tenner for another clinical visit on January 14, 2015. Johnson-Tenner noted that the swelling in Plaintiff's wrist had further decreased and the cast was loose. Johnson-Tenner further noted that Plaintiff had not been seen by an orthopedist as she had ordered after the visit on November 21, 2014. Johnson-Tenner ordered Plaintiff's cast to be removed, for his arm to be cleaned, and for a new cast to be set. Johnson-Tenner then submitted another request for Plaintiff to be seen for an orthopedic consultation.

///

Less than a week later, on January 20, 2015, Plaintiff was evaluated by orthopedist Dr. Galang at San Joaquin General Hospital via telemedicine and with the assistance of nursing staff. Dr. Galang noted that Plaintiff was previously evaluated by Dr. Crooks. Dr. Galang further noted that Plaintiff was still complaining of pain in his right wrist and that the most recent scan showed a continued distal radial fracture with no significant displacement. Dr. Galang recommended that Plaintiff undergo a new x-ray of his right wrist without the cast. He then recommended that Plaintiff wear a brace after that and to be seen again for a follow-up appointment after the x-ray is completed.

Plaintiff presented to Johnson-Tenner shortly after his telemedicine appointment with Dr. Galang for a follow-up clinical evaluation. Johnson-Tenner ordered Plaintiff's cast to be removed and x-rays to be taken of his wrist. She further ordered that telemedicine should be notified when the x-ray findings were available and that Plaintiff should be provided with a wrist brace per Dr. Galang's recommendation.

Plaintiff underwent an x-ray of his wrist the same day showing that the distal radius fracture appeared to be healed, alignment was stable, and there was no new fracture. The x-ray also showed mild wrist joint and intercarpal arthritis, which is a possible complication as a result of the injury. (Johnson-Tenner Decl. ¶ 54; Garcia Decl. Ex. A, at AGO 061.) Plaintiff's housing assignment changed after this appointment, and Johnson-Tenner did not provide further direct clinical care.

Plaintiff's medical records indicate that Plaintiff was later seen by Dr. Crooks, his original orthopedist, to discuss the x-ray findings on March 20, 2015. Dr. Crooks noted that there was no clinical need for surgery or further treatment other than providing Plaintiff his removable splint. (Johnson-Tenner Decl. ¶ 63; AGO 080-081.)

Defendant has met her burden of proof in demonstrating she was not deliberately indifferent to Plaintiff's medical needs, and the burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co., 475 U.S. at 586. In attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the mere allegations or denials of his pleading; he is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.

In his verified complaint, Plaintiff contends that Defendant Johnson-Tenner was aware of a specific need for surgery based on the recommendation of the orthopedic surgeon and delayed in providing the required surgery. (Compl. at ¶¶ 31-34, 39-41, 44-46.) Plaintiff further contends that due to the delay in providing surgery, his wrist is now deformed and surgery cannot be performed.[3] (Compl. at ¶¶ 44-50.) In his opposition, Plaintiff argues that Johnson-Tenner was deliberately indifferent because she ordered a CT scan without contrast, as opposed to a CT scan with contrast, and because she did not order his immediate return to the orthopedic specialist after the CT scan. (Pl. Opp'n at 7.) Plaintiff further argues that Johnson-Tenner was deliberately indifferent because she was more concerned about her holiday season than treating his wrist, and she simply re-cast his arm several times instead of ordering surgery. (Id. at 15.) Plaintiff further argues that non-party Dr. Galang, the second orthopedist he met with, "simply [went] along with NP Johnson-Tenner's program to dispose of this case." (Id. at 16.)

Plaintiff's argument that Johnson-Tenner ordered a CT scan without contrast instead of a CT scan with contrast is neither genuine nor material. Dr. Crook's note did not specifically call for a CT scan with contrast. (Garcia Decl. Ex. A, at AGO 018.) Thus, Plaintiff's contrary lay opinion does not produce a dispute of fact. Further, even if Dr. Cook's note specified CT with contrast, Plaintiff is essentially presenting an expert opinion of which he is not qualified to provide. Fed. R. Evid. 701, 702. Nonetheless, there is no evidence that ordering a CT scan without contrast was medically unacceptable under the circumstances.

Plaintiff's argument that Johnson-Tenner failed to order follow-up orthopedic consultations also lacks merits. Johnson-Tenner declared that she entered orders after each clinical visit with Plaintiff, and the medical records support the finding that she ordered the initial orthopedic consultation on October 13, 2014. (Johnson-Tenner Decl. ¶ 12; Garcia Decl. Ex. A, at AGO 014.) Plaintiff saw Dr. Crooks (an orthopedic specialist) on October 20, 2014. (Johnson-Tenner Decl. ¶ 18; Garcia Decl. Ex. A, at AGO 018.) Johnson-Tenner then entered another order for a follow-up

---

[3] A verified pleading constitutes an opposing affidavit for purposes of summary judgment rule. Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004).

consultation on November 5, 2014, which was one day after her second clinical visit with Plaintiff.[4] Johnson-Tenner then entered another request for a follow-up consultation on November 21, 2014, and noted that Plaintiff was last seen by an orthopedist on October 20, 2014. (Johnson-Tenner Decl. ¶¶ 30-32; Garcia Decl. Ex. A, at AGO 040-041.) She then entered yet another request for consultation on December 9, 2014. (Johnson-Tenner Decl. ¶¶ 38-39; Garcia Decl. Ex. A, at AGO 046.) She then submitted another request for an orthopedic referral after the appointment on January 14, 2015, and again noted that Plaintiff had not been seen for a follow-up consultation per her previous orders. (Johnson-Tenner Decl. ¶¶ 46-48; Garcia Decl. Ex. A, at AGO 053-054.) She then ordered that Plaintiff's imaging be forwarded to the orthopedist for further follow-up on January 20, 2015. (Johnson-Tenner Decl. ¶¶ 50-52; Garcia Decl. Ex. A, at AGO 056-059.)

Defendant Johnson-Tenner declared that she only makes referrals but does not schedule the actual appointments as that is done by other staff members, and there is no evidence to the contrary. Plaintiff's claim that his wrist is now deformed is belied by the medical records. The medical evaluations conducted after his referrals to orthopedic indicate that he suffered no deformity, surgery was not necessary, and his fracture had healed. (Garcia Decl. Ex. A, at AGO 061, AGO 080-081, AGO 086-087.)

The undisputed facts demonstrate that Defendant Johnson-Tenner evaluated Plaintiff on several different occasions and took his vital signs, conducted clinical evaluations of his wrist, submitted requests for specialty consultations, ordered diagnostic imaging, prescribed medication and appliances, and provided Plaintiff with housing accommodations.[5] There is no evidence that

---

[4] Plaintiff points out that this referral was noted as "pre-op." (Pl. Opp'n at 34.) Johnson-Tenner explained that "pre-op" was in reference to the estimate time for service, and although the request was routine and not urgent, it would be done as quickly as possible under the routine guidelines, and generally completed within fourteen to twenty-one days. (Johnson-Tenner Decl. ¶ 25; Garcia Decl. Ex. A, at AGO 026.) In addition, it is clear that Dr. Crook's medical notes did not call for surgery, but rather for a short arm cast, a CT scan, and return after the CT scan. (Id.)

[5] The instant case is distinguishable from the Ninth Circuit's decision in Jett v. Penner, 439 F.3d 1091 (9th Cir. 2006). In Jett, the inmate fell from a top bunk to the floor and fractured his right thumb. He was taken to the hospital where a temporary splint was placed on his thumb. The Ninth Circuit held that the nearly 2-month wait to see a doctor following his release from the hospital and diagnosis of the fractured thumb and 19-month delay before seeing a hand specialist, as well as the complete failure to set and cast the inmate's badly-fractured thumb, during which it "healed improperly," created a triable issue of fact. Jett, 439 F.3d at 1097-98. Here, in contrast to the circumstances in Jett, during the time that Defendant Johnson-Tenner treated Plaintiff from October 2014 to January 2015, she provided Plaintiff a brace and sling,

Defendant Johnson-Tenner rejected any orthopedist recommendations or caused any intentional delay in treatment, or that the treatment provided fell below the medical standard of care. Accordingly, Defendant Johnson-Tenner is entitled to summary judgment.[6]

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.     Defendants' motion for summary judgment be granted; and

2.     The Clerk of Court be directed to enter judgment in favor of Defendants.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within **twenty-one (21) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **May 23, 2019**

UNITED STATES MAGISTRATE JUDGE

---

ordered further specialty consultations, ordered further diagnostic imaging, ordered adjustments to his casts, prescribed him medications as necessary, provided necessary housing accommodations, and there was no orthopedic order for surgery.

[6] Because the undersigned has found that summary judgment should be granted in favor of Defendants, the Court need not reach Defendants alternative argument regarding qualified immunity.